UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLENN D. BRADBURY,<br><br>                    Plaintiff,<br><br>          v.<br><br>ANDREW SAUL,<br><br>                    Defendant. | Case No.    3:19-CV-01667-WHO<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 19 and 20 |

The parties have filed cross-motions for summary judgment in this Social Security appeal. After reviewing the parties' papers and the administrative record, I GRANT plaintiff Glenn D. Bradbury's motion, DENY the Commissioner of Social Security's motion, and remand this case for further proceedings.

## BACKGROUND

### I.       PROCEDURAL HISTORY

Bradbury filed a claim for Title II disability insurance benefits on October 26, 2015. Administrative Record ("AR") 86.  The Social Security Administration denied his claim on February 18, 2016.  AR 105.  He filed a request for reconsideration, which the Social Security Administration denied on June 9, 2016.  AR 112.  He then requested a hearing that was held on November 27, 2017, before Administrative Law Judge ("ALJ") Michael A. Cabotaje.  AR 117, 32.  Bradbury and Malcolm Brodzinsky, a vocational expert ("VE"), testified.  AR 32.  On June 7, 2018, the ALJ issued a decision finding that Bradbury was not disabled.  AR 25.  The Appeals Council denied Bradbury's request for review of the ALJ's decision, AR 1–3, and Bradbury timely appealed the ALJ's decision.

### II.      WORK AND MEDICAL HISTORY

Bradbury claims that he is disabled as a result of (i) neck and back pain and (ii) depression. AR 68, 87.  He alleges that he became disabled, as defined under the Act, as of November 26, 2014, although he had neck pain that started in mid-2013.  AR 68, 88; *see also* AR 37.  He most recently worked as an "apartment manager and mobile home manager."  AR 37.  As a manager, he

was asked to "dig holes to plant flowers/plants, clean laundromat/machines (washers and dryers), spray/pull weeds around complex, prune plants/trees, fix cooler pumps, [and] use blower around complex." AR 225. He also "lifted ladder[s] to get on roof/change lights, carried leaf blower[s], carried weed sprayer, lifted bags of soil/plants, [miscellaneous] things and carried them around [the apartment] complex and mobile home park … ." *Id.*

On November 26, 2014, when Bradbury was working as a manager, he was stomping on garbage in a dumpster. AR 42. He fell out of the dumpster, hit the left side of his body, and was taken to the emergency room. AR 659. He was fired from his manager job on the same day as his fall and filed a California Workers' Compensation Form dated December 5, 2014. AR 618, 717. He has not worked since November 26, 2014. AR 203.

### A.    Medical Provider Records

#### 1.    Physical Impairments

##### a.    Jeffrey S. Yablon, M.D.

Jeffrey S. Yablon, M.D. conducted an "initial neurosurgical consultation" of Bradbury on September 3, 2013, at the University of California-San Francisco facility in Napa, California. AR 761–765. Six months before visiting Yablon, Bradbury "developed the insidious onset of shoulder pain followed by left arm numbness and tingling radiating into his left thumb" that "was followed shortly thereafter by neck pain." AR 761. Yablon reviewed a "cervical MRI scan" showing that Bradley had a "moderately large central left-sided disc osteophyte complex pushing the thecal sac back posteriorly and severely compressing the left C6 root." *Id.* Yablon opined that Bradbury had "left C6 radiculopathy secondary to be aforementioned pathology." AR 764. Yablon discussed with Bradbury the treatment options of "conservative therapy versus surgery." Instead of choosing surgery, Bradbury indicated that he "would like to try physical therapy and cervical epidural steroids." *Id.*

##### b.    Michael T. Young, D.O.

Michael T. Young, D.O., started treating Bradbury on November 12, 2013. AR 1310. Young met with Bradbury monthly through 2017. *Id.* Young's treatment of Bradbury included two cervical epidural steroid injections. AR 652 (December 9, 2013), 663 (December 15, 2014).

2

1  Young also referred Bradbury to physical therapy and prescribed medications, including Percocet,

2  from November 4, 2014, to May 12, 2017.  AR 655 (November 4, 2014), 659 (December 3, 2014),

3  666 (February 3, 2015), 671 (March 3, 2015), 675 (April 14, 2015), 679 (May 12, 2015), AR 683

4  (June 10, 2015), 687 (July 8, 2015), 692 (August 7, 2015), 697 (September 4, 2015), 701

5  (September 29, 2015), 705 (October 2, 2015), 709 (October 30, 2015), 1209 (December 31, 2015),

6  1214 (December 31, 2015), 1219 (January 29, 2016), 1225 (February 26, 2016), 1235 (March 25,

7  2016), 1240 (April 21, 2016), 1245 (May 20, 2016), 1250 (June 16, 2016), 1255 (July 15, 2016),

8  1262 (August 16, 2016), 1274 (September 14, 2016), 1279 (October 13, 2016), 1284 (November

9  11, 2016), 1289 (January 13, 2017), 1301 (March 14, 2017), 1306 (May 12, 2017); *see also* AR

10  1310 (Medical Source Statement where Young described his overall treatment of Bradbury).

11      Young's treatment notes document how physical activity affected Bradbury's neck pain.

12  In notes dated November 12, 2013, Young wrote that Bradbury "has noticed that his neck pain

13  gradually developed with numbing and tingling sensation radiating down to his left arm" and

14  "[a]ny type of activity aggravates his pain."  AR 648.  In notes from a visit on December 3, 2014,

15  Young wrote under the "History of Present Illness" section, "[a]ny type of activity aggravates

16  [Bradbury's] pain."  AR 659.  Under the "Chief Complaint" section of the treatment notes dated

17  May 12, 2015, Young wrote, "neck pain."  AR 678.  The "History of Present Illness" section of

18  the notes states that Bradbury's "neck pain has been increasing, pain increases with pushing,

19  pulling, and lifting … . Neck pain is at base of the neck and radiates into his back … ."  *Id.*

20  Reports of Bradbury's neck pain increasing with pushing, pulling, and lifting are found in all of

21  Young's treatment notes from June 2015 through May 2017.  AR 682 (June 10, 2015), 686 (July

22  8, 2015), 691 (August 7, 2015), 696 (September 4, 2015), 700 (September 29, 2015), 704 (October

23  2, 2015), 708 (October 30, 2015), 1208 (December 31, 2015), 1213 (December 31, 2015), 1218

24  (January 29, 2016), 1224 (February 26, 2016), 1234 (March 25, 2016), 1239 (April 21, 2016),

25  1244 (May 20, 2016), 1249 (June 16, 2016), 1254 (July 15, 2016), 1261 (August 16, 2016), 1273

26  (September 14, 2016), 1278 (October 13, 2016), 1283 (November 11, 2016), 1288 (January 13,

27  2017), 1300 (March 14, 2017), 1305 (May 12, 2017).

28      The treatment notes also explain that lying down provides some relief for Bradbury's neck

and back pain.  AR 1218 (January 26, 2016 treatment notes recording, under the "Chief Complaint" section, that "currently [Bradbury] suffered from chronic pain to neck and lower back. … he doesn't get any relief unless he lies down"); AR 1239 (notes dated April 21, 2016, stating, "[u]sually [Bradbury] lies down, his numbness in his left arm would go away however he notices that numbness has to be persistent").

Young completed a "Medical Source Statement - Physical Questionnaire" dated September 7, 2017 ("Medical Source Statement").  AR 1310–12.  He diagnosed Bradbury with cervical spine stenosis.  AR 1310.  He also gave his opinion on Bradbury's "<u>ability to *perform and sustain* </u>various activities."  *Id.* (emphasis in original).  He said that Bradbury can "occasionally … lift and carry in a competitive work situation" 10–20 pounds.[1]  *Id.*  If Bradbury was "placed in a ***<u>full-time competitive work situation (8 hrs per day, 5 days per week, or an equivalent schedule)</u>*,**" Young opined that he could "**sit *at one time***, e.g., before needing to get up, or lie down, etc." for 20 minutes at a time for up to two hours in an eight-hour workday.  AR 1311 (emphasis in original).  When asked how long Bradbury could "**stand *at one time***, e.g., before needing to sit down, lie down, walk around, etc.," Young repeated the opinion above--20 minutes at a time for up to two hours in a workday.  *Id.* (emphasis in original).  However, when asked whether Bradbury's "condition require[s] him to lie down/recline during the day," Young stated "no."  *Id.*  Immediately after that response, Young gave his opinion on Bradbury's "Cervical-spine/neck" condition.  *Id.*  Young opined that Bradbury could "rarely" "[l]ook down (sustained flexion of neck)[,] [t]urn head right or left[,] [l]ook up[, or h]old head in [a] static position."[2]  *Id.*  When asked whether Bradbury's "cervical spine/neck pain require[s] him to rest his head/neck during the day (i.e., either lying down, resting head against [a] pillow, etc)," Young replied, "yes," "every 2 h[ou]rs."  *Id.*

### c.     Mark H. Luoto, M.D.

Mark H. Luoto, M.D., saw Bradbury in connection with his workers' compensation

---

[1] "Occasionally" is defined as "6% to 33% of an 8–hour working day."  AR 1310.

[2] "Rarely" is defined as "1% to 5% of an 8–hour working day."  AR 1310.

4

benefits.  AR 893.  Bradbury met with Luoto on five separate occasions in 2015.  For each visit, Luoto filled out a document titled "Job Care Clinic Report" ("Report").  AR 574–75 (April 20, 2015), 715–16 (March 9, 2015), AR 717–18 (January 23, 2015), 890–92 (July 20, 2015), 910–12 (June 8, 2015).  A separate document titled "Work Status" was also completed during each visit.[3]  AR 565 (July 20, 2015), 568 (June 8, 2015), 573 (April 20, 2015), 578 (March 9, 2015), 583 (January 23, 2015).

The Reports document Bradbury's complaints regarding his neck, back, arm, and leg pain.  The Report from the January 23, 2015, visit states that Bradbury "has longstanding neck and left arm pain."  AR 717.  Bradbury "does have some chronic back pain, but now has back pain with bilateral leg pain, primarily left leg pain to his calf."  *Id.*  The pain "is all exacerbated by a fall out of a dumpster."  *Id.*  The Report from the March 9, 2015, visit states that Bradbury "is developing more back and left leg pain."  AR 715.  The Report from the June 8, 2015, visit states Bradbury "has back pain that is still there with upper leg pain . . . ."  AR 910.  The Report from the July 20, 2015, visit states Bradbury "has ongoing neck pain" and "back pain with intermittent bilateral leg pain generally above the knees."  AR 890.

At the conclusion of each Report, Luoto opined on Bradbury's ability to lift, bend, and stoop.  Under the "work status" section of the Report from the January 23, 2015 visit, Luoto wrote, "No lifting greater than 10–15 pounds, no overhead lifting.  No repetitive bending or stooping."  AR 718.  In his Report from the March 9, 2015 visit, Luoto stated, "No lifting greater than 10–15 pounds, no lifting overhead, no repetitive stooping."  AR 716.  The Report from Bradbury's April 20, 2015, visit included "No lifting greater than 10–15 pounds, no significant bending or stooping."  AR 575.  The Report from the June 8, 2015, visit declared "no lifting greater than 15 pounds, no excessive bending or stooping."  AR 891; *see also* AR 911 (Report from July 20, 2015, stating "[n]o lifting greater than 15 pounds.  No excessive bending or stooping.").

---

[3] The "Work Status" documents were completed during or immediately following Bradbury's examinations.  The Reports were more comprehensive and usually completed the day after Bradbury's examinations.

United States District Court
Northern District of California

The Work Status forms also have checkboxes indicating a person's ability to perform various physical activities, such as, "lift/carry," "bend," "squat," "kneel," "climb," and "push/pull." AR 565, 568 (same), 578 (same), 583 (same). Each physical activity can be performed in the degrees of "not at all," "occasionally," or "frequently." *Id.* For the Work Status forms from January 23, 2015 – April 20, 2015, Luoto did not use those checkboxes, but instead simply wrote "[n]o lifting [greater than] 10–15 [pounds]." AR 573 (April 2015), 578 (March 9, 2015), 583 (January 23, 2015). Luoto also did not use the checkboxes on the Work Status forms from June 8, 2015, and July 20, 2015, instead writing "[n]o lifting [greater than] 15 [pounds]." AR 565 (July 2015), 568 (June 2015). While the Work Status forms did not ask specifically about neck function or neck pain, in every Work Status form, under the "Diagnosis" section, "neck" & "back pain" were listed. AR 565 (July 20, 2015), 568 (June 8, 2015), 573 (April 20, 2015), 578 (March 9, 2015), 583 (January 23, 2015).

### 2.    Mental Impairments

Bradbury claims to suffer from depression. AR 68, 87. In 2005, Bradbury was diagnosed with a major depressive disorder and "posttraumatic stress symptoms" following the death of his girlfriend. AR 828 (Brian Thomas, M.D. visit notes dated August 11, 2005). The record shows that to treat Bradbury's depression and PTSD, he was prescribed Lexapro or Citalopram starting in January 2010 and through at least December 2015. AR 290 (records showing Bradbury switching from Citalopram to Lexapro starting March 30, 2015), AR 335 (records showing Bradbury taking Citalopram starting October 4, 2013), AR 374 (records showing Bradbury being prescribed Lexapro from January 27, 2010 – November 12, 2012), AR 393 (records showing Bradbury being prescribed Citalopram from January 8, 2013 – May 21, 2013), AR 1001 (records showing Bradbury still being prescribed Lexapro, seeking a higher dosage on December 15, 2015). After the dumpster accident and getting fired from his job in November 2014, Bradbury started seeing Kevin Gutfield, LCSW, for psychotherapy. AR 948–50. In July 2016, Bradbury's treating physician (Young) also recommended that Bradbury receive "cognitive behavioral therapy" for a "multidisciplinary approach to his chronic pain." AR 1258.

Gutfield provided monthly psychotherapy to Bradbury between December 19, 2014, and

United States District Court
Northern District of California

1   December 15, 2015.  AR 938, 999.  Gutfield diagnosed Bradbury with a "[d]isorder, prolonged

2   posttraumatic stress" and "[d]epressive disorder, major, recur[rent], mild."  295 (March 30, 2015),

3   297 (March 27, 2015), 302 (March 16, 2015), 309 (February 12, 2015), AR 319 (December 29,

4   2014).

5       Gutfield's visit notes document the severity of Bradbury's depressive symptoms.  In

6   Gutfield's notes dated February 12, 2015, Bradbury "admit[ted] to having a [history] of

7   depression."  AR 307.  Bradbury told Gutfield he took Lexapro for his depression, and it helped

8   him "significantly" like "[l]ife was fresh every day."  *Id.*  In  notes dated March 16, 2015, under

9   the "Current Assessment" section, Bradbury reported that he "is depressed secondary to not

10  working/financial problems and other life stressors."  AR 299.  In the same notes, Gutfield wrote

11  that Bradbury scored a 17 on a PHQ9 (Patient Health Questionnaire) test, which "indicates major

12  depressive disorder."  *Id.*  In Gutfield's notes dated March 30, 2015, under the "Current

13  Assessment" section, Bradbury "relates [an] increase in [symptoms] of depression."  AR 294.

14  Under the "Response to Interventions/Progress Towards Goals and Objectives" section, it states

15  that Bradbury "has increased [symptoms] of depression secondary to losing his job and not

16  hav[ing] a stable place to live."  AR 296.  In his notes dated July 24, 2015, Gutfield wrote that

17  Bradbury "feels somewhat depressed but that is situational by self[-]report."  AR 993.

18      Gutfield completed a "Short–Form Evaluation for Mental Disorders" dated December 1,

19  2015 ("Mental Evaluation").  AR 938–42.  In the Mental Evaluation, Gutfield diagnosed Bradbury

20  with Major Depressive Disorder.  AR 938.  Gutfield opined that Bradbury has a "depressed …

21  mood" with "flat … affect."  AR 939.  Under the "Progress in Treatment and Prognosis" section,

22  Gutfield wrote, "[Bradbury] does well in [treatment] but has chronic pain [and] depression … ."

23  AR 940.  Gutfield said that Bradbury has a "fair" ability to "[c]omplete a normal workday and

24  workweek without interruptions from psychologically based symptoms."[4]  AR 941.  Gutfield also

25  stated that Bradbury has a "[g]ood" ability to "[m]aintain concentration, attention, and pace" and

26

27  ─────────────────────
    [4] "Fair" means the "evidence supports the conclusion that the individual's capacity to perform the
    activity is impaired, but the degree/extent of the impairment needs to be further described."  AR
28  941.

United States District Court
Northern District of California

"[p]erform activities within a schedule and maintain regular attendance."[5]  *Id.*

**B.      State Agency Consultants**

**1.      A. Amarnath and M. Acinas, M.D.**

A. Amarnath reviewed Bradbury's case file and issued a physical Residual Functional Capacity assessment ("RFC") at the initial level dated December 16, 2015.  AR 78–80.  Amarnath opined that Bradbury could "occasionally … lift and/or carry (including upward pulling)" 20 pounds, and "frequently … lift and/or carry (including upward pulling)" 10 pounds.[6]  AR 78. During an eight–hour workday, Bradbury could "stand and/or walk" and "sit (with normal breaks)" for "about 6 hours."[7]  AR 78–79.  Amarnath stated that Bradbury could frequently climb ramps or stairs, and occasionally climb ladders, ropes, or scaffolds; he could occasionally stoop, kneel, and crouch. AR 79.  Finally, Bradbury should "[a]void concentrated exposure" to "[h]azards (machinery, heights, etc.)."  AR 80.

M. Acinas, M.D. reviewed Bradbury's case file and issued a physical RFC at the reconsideration level dated June 8, 2016.  AR 96–98.  Acinas opined that Bradbury could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, and during an eight–hour workday, he could stand and/or walk and sit (with normal breaks) for "about 6 hours." AR 96–97.  Acinas stated that Bradbury could frequently climb ramps or stairs, and occasionally climb ladders, ropes, or scaffolds, and could occasionally stoop, kneel, and crouch.  *Id.*  Bradbury should "[a]void concentrated exposure" to "[h]azards (machinery, heights, etc.)."  AR 98.

**2.      Phillip M. Cushman, Ph.D.**

Phillip M. Cushman, Ph.D. is a clinical psychologist who examined Bradbury at the

---

[5] "Good" is defined as "[t]he effects of the mental disorder do no significantly limit the individual from consistently and usefully performing the activity."  AR 941.

[6] "Occasionally" means "cumulatively more than 1/3 up to 2/3 of an 8 hour day."  AR 78. "Frequently" means "cumulatively more than 1/3 up to 2/3 of an 8 hour day."  AR 78.

[7] When determining an RFC, the Social Security Administration requires that in "order to perform a full range of sedentary work, an individual must be able to remain in a seated position for approximately 6 hours of an 8-hour workday, with a morning break, a lunch period, and an afternoon break at approximately 2-hour intervals."  SSR 96-9p, 1996 WL 374185, at *6 (July 2, 1996).

1   request of the State agency and submitted a "Psychological Evaluation" dated January 7, 2016.

2   AR 1010–14.  Cushman diagnosed Bradbury with: "Opioid Dependence, under physician's care;"

3   "Opioid–Induced Mood Disorder;" "Pain Disorder Associated with both Psychological Factors

4   and a General Medication Condition, chronic;" and "Adjustment Disorder with Mixed Anxiety

5   and Depressed Mood."  AR 1014.

6        Cushman opined that Bradbury's pain will affect his ability to work, concluding that

7   Bradbury will have "difficulties at this time with regular attendance and consistent participation,

8   with complaints of pain and malaise."  *Id.*  Due to "complaints of pain and malaise," Bradbury

9   will also "have a difficult time working a normal workday or work week . . . ."  Bradbury "does

10  appear capable of getting along with supervisors, coworkers, and the general public when he is

11  experiencing less pain."  *Id.*  When Bradbury is "experiencing less pain," Cushman opined that he

12  has the "ability to deal with the usual stressors encountered in a competitive work environment."

13  *Id.*

14       **3.**     **Lisa Fitzpatrick, Psy.D. and L. Colsky, M.D.**

15       Lisa Fitzpatrick, Psy.D. reviewed Bradbury's case file and issued an Adult Medically

16  Determinable Impairments ("MDI") report dated February 17, 2016, and a mental RFC dated

17  February 17, 2016. AR 76–77, 80–81.  Under the "Impairments" section of the MDI, Fitzpatrick

18  listed "Affective Disorders" and indicated that they are "Severe."  AR 76.  For the mental RFC,

19  Fitzpatrick opined that Bradbury has a "moderately limited" ability to "carry out detailed

20  instructions" and "maintain attention and concentration for extended periods."  AR 80–81.  He

21  also has a "moderately limited" "ability to understand and remember detailed instructions."  AR

22  80.  Fitzpatrick stated that Bradbury is "[u]nable to consistently remember/understand moderately

23  to highly complex/detailed instructions."  *Id.*  He is "able to tolerate simple changes in routine,

24  avoid hazards, travel independently, and make/carry out simple plans."  AR 81.

25       L. Colsky, M.D. reviewed Bradbury's case file and issued an MDI dated June 7, 2016, and

26  a mental RFC dated June 7, 2016.  AR 94–95, 98–100.  Under the "Impairments" section of the

27  MDI, Colsky listed "Affective Disorders" and indicated they were "Severe."  AR 94.  For the

28  mental RFC, Colsky opined that Bradbury has a "moderately limited" ability to "carry out detailed

instructions" and "maintain attention and concentration for extended periods." AR 99. Colsky stated that Bradbury's "ability to understand and remember very short and simple instructions" was "[n]ot significantly limited." AR 98. Bradbury is "[u]nable to consistently remember/understand moderately to highly complex/detailed instructions," but is "[a]ble to tolerate simple changes in routine, avoid hazards, travel independently, and make/carry out simple plans." AR 98–99.

### C.    The ALJ Hearing

Bradbury's hearing before the ALJ was held on November 27, 2017. AR 32. During the hearing, Bradbury described his neck and arm pain. Bradbury testified that the pain "starts in my neck and it runs down my arm and it's just my whole arm goes numb all the way to my fingertips." AR 43. When asked about holding his head up or changing its position, Bradbury stated, "I'm just trying to get comfortable and I just don't have a way to do it." AR 65. When asked if he could turn his head, Bradbury testified that he can turn "[m]ore to the left than the right, but … it puts a sharp pain in my shoulder, in my shoulder blade when I turn my head." *Id.* Bradbury stated that laying on his stomach, "makes my head go back … and it puts [my neck] in a bind and it makes everything go numb." AR 66.

When asked how he deals with the pain, Bradbury testified that if he was at home, he would "take a couple pain pills, go lie down and try to get to the position where I could get most comfortable." AR 43. To manage the pain, Bradbury stated that "[s]tanding up is a little better than sitting down, but I just can't do either one it seems like." *Id.*

During the hearing, Bradbury explained that he saw Luoto in 2015 "to continue workers' comp[ensation] … ." AR 52. When asked whether Luoto assessed Bradbury's "back and all of your conditions," Bradbury stated that he saw Luoto on a "month–to–month" basis and "he just wanted to see if I was improving." AR 53. He then testified that "it got to a point where I seen [sic] [Luoto] long enough to where he didn't think it was getting better … ." *Id.* After listening to Bradbury explain his visits with Luoto, the ALJ stated, "[s]o here is my issue. There are limitations assessed by [Luoto] and there are limitations assessed by Young. One is more severe than the other but they seem to be considering the same impairments." AR 54.

10

1          Brodzinsky, the VE, testified at the hearing following Bradbury.  AR 27.  The ALJ asked

2   the VE two hypothetical questions about an individual of Bradbury's age, education, and work

3   experience, with the limitation that "[t]his person can lift and carry no more than 15 pounds as

4   opposed to 20."  AR 58.  In this hypothetical, the ALJ stated that this individual could "frequently

5   climb ramps and stairs, occasionally climb ladders, ropes and scaffolds, occasionally stoop, kneel,

6   crouch and crawl."  *Id.*  First, the ALJ asked the VE if this hypothetical individual could perform

7   Bradbury's past jobs and the answer was "[n]o."  AR 59.  The VE also provided three available

8   jobs for this hypothetical individual.  AR 59–60.  For his second question, the ALJ added the

9   limitation that the hypothetical individual could "stand and walk for two hours and sit for two

10  hours."  AR 60.  When asked if the hypothetical individual could perform in any jobs in the

11  national economy, the VE replied "[n]o."  *Id.*

12         Bradbury's attorney cross-examined the VE.  He asked two questions using the same

13  hypothetical individual as the ALJ, but with an additional limitation for each question.  First, the

14  VE was asked if the hypothetical individual was "off task 15% of the day," would the available

15  jobs discussed by the VE be affected.  AR 61.  The VE replied, "[t]hat would eliminate all of the

16  jobs I talked about."  *Id.*  Second, the VE was asked how the available jobs would be affected if, in

17  addition to the off-task limitation, the hypothetical individual needed "unscheduled breaks of 15

18  minutes" every two hours.  The VE replied such a limitation "would preclude all work."  *Id.*

## III.   ALJ'S DETERMINATION

20         The ALJ followed the "five-step sequential evaluation process."  AR 16.  At Step One, the

21  ALJ found that Bradbury "has not engaged in substantial gainful activity since November 26,

22  2014."  AR 17.  At Step Two, the ALJ found that Bradbury "has the following severe

23  impairments: cervical and lumbar degenerative disc disease."  *Id.*  He determined that Bradbury's

24  mental impairment of depression did not cause more than minimal limitations and, therefore, was

25  non-severe.  *Id.*  In doing so, the ALJ considered the four broad areas of mental functioning and

26  concluded that in each — based on the opinions of the Cushman and Gutfield, Bradbury's

27  therapist — Bradbury's depression caused only mild limitations in any functional areas.  AR 17-

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18.[8]   At Step Three, the ALJ found that Bradbury's stenosis was not an impairment that meets or medically equals the severity of one of the listed impairments ("List of Impairments") in 20 C.F.R., Part 404, Subpart P, Appendix 1.  AR 18-19.

In determining Bradbury's Residual Functional Capacity (RFC), the ALJ found the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) with the following limitations: "he can lift and carry no more than 15 pounds; frequently climb ramps and stairs; occasionally climb ladders, ropes, and scaffolds; and occasionally stoop, kneel, crouch, and crawl. He cannot work with exposure to unprotected heights or heavy moving machinery." AR 19.

Concerning Bradbury's testimony regarding how his pain (neck, arm, and back) and how numbness limited his mobility and ability to sit, the ALJ concluded that Bradbury's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely consistent" with the medical and other evidence in the record.  AR 20.  The ALJ noted that Bradbury's 2013 MRI supported his claim of limited ability "to use his upper left extremity," but the evidence of record (including that Bradbury continued to work after the MRI until his injury in 2014) did "not support the claimant's alleged inability to sit or stand/walk for prolonged periods" or his claims of intense pain.  AR 20.  The ALJ supported his decision by pointing out that Bradbury received only minimal and conservative treatment (Percocet, occasional injections, and physical therapy) and that his chronic pain therapy (cognitive behavioral therapy and medication) sought to treat only "mild" symptoms and those improved with medications.  AR 20–21.

Reviewing the opinion evidence, the ALJ gave "partial weight" to "the multiple opinions from the treating physician, Mark Luoto, M.D."  AR 21.  The ALJ noted Luoto's opinions (all from 2015) that Bradbury "could lift 10 to 15 pounds, with no overhead lifting, and no repetitive bending or stooping."  The ALJ accepted only "the 15–pound lifting [as] consistent with the record as a whole and with the multiple opinions in the record from other sources, indicating the

---

[8] The "paragraph B" criteria considers whether a claimant has:  "1. Marked restriction in activities of daily living; or 2. Marked difficulties in maintaining social functioning; or 3. Marked difficulties in maintaining concentration, persistence or pace; or 4. Repeated episodes of decompensation, each of extended duration[.]" 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Subpt. P, App. 1, § 12.00.A, § 12.04.B.

1   claimant is able to work with some restrictions." *Id.*

2        The ALJ assigned "great weight" to Amarnath and Acinas, the State agency medical

3   consultants, who completed the physical RFCs at the initial and reconsideration levels.  The ALJ

4   found that their opinions were "consistent with the record as a whole" except that the consultants'

5   20-pound lifting determination was too high, and instead Bradbury's "lifting limitation of 15

6   pounds is supported by the treating source opinion … ."  AR 22.

7        The ALJ gave only "partial [w]eight" to "treating physician" Young's 2017 opinion "to the

8   extent that it is consistent with Luoto's multiple opinions."  AR 23.  The ALJ noted that Young

9   opined that Bradbury can "sit for 20 minutes at a time for about two hours total in an eight–hour

10  workday; and can stand/walk for 20 minutes at a time for about two hours; with no requirement to

11  lie down or recline during the day."  AR 22.  But the ALJ discounted Young's opinion that

12  Bradbury's "neck motion [is] limited to 'rarely,' with the need to rest the head/neck every two

13  hours," because that assessment (requiring rest of the head/neck) was "internally inconsistent"

14  with his prior opinion that Bradbury could stand/walk for up to two hours a day without needing to

15  lie down.  *Id.*

16       The ALJ also concluded that Young's limitation of Bradbury to only "rare" neck

17  movement was not supported by the record because Luoto in 2015 "did not include any limitations

18  in terms of neck movement in his assessment of the claimant's cervical impairment."  *Id.*  Young's

19  neck limitation was further discounted because Bradbury did not "allege any problems moving his

20  head or neck" and he did not "exhibit any problems in this regard while testifying at the hearing."

21  AR 22–23.

22       Of the sources who opined on Bradbury's physical limitations, the ALJ found most

23  compelling the opinions of "Luoto, which consistently showed only a 15–pound lifting limitation

24  and a preclusion from excessive stooping and bending, and the opinions of the State agency

25  physicians … ."  AR 23.  Since the ALJ had "two sets of persuasive opinions" (Luoto's and

26  Young's), he again "considered the extent of treatment," which was conservative and which led to

27  some improvement, to conclude that Bradbury was not as limited at Young contended.  AR 23.

28       In determining Bradbury's RFC, the ALJ gave partial weight to Gutfield (Bradbury's

United States District Court
Northern District of California

13

treating psychotherapist), noting that in a 2015 evaluation Gutfield opined that Bradbury's functioning was unlimited or good, except for the ability to complete a normal workday, which was "fair." AR 21. The ALJ found that limitation was attributed to pain, not depression. *Id.* The ALJ also gave partial weight to the 2016 opinions of Cushman (examining psychologist), finding that the limitations indicated by Cushman were mild and consistent with a finding that mental limitations are non-severe, and that "any limitations that are more than mild can be attributed to pain and malaise, and possible opioid dependence." AR 22. The ALJ gave little weight to the opinions of Fitzpatrick and Colsky (the state agency medical consultants for Bradbury's mental impairments) that Bradbury had moderate limitations affecting concentration, persistence, and pace as "inconsistent with the record as a whole, which reflects that the claimant has only mild limitations that are generally associated with pain versus a mental disorder." *Id.* While the ALJ acknowledged Young's opinion on Bradbury's mental impairments that Bradbury experienced "pain of such severity that it frequently interferes with [h]is attention, concentration, persistence, and pace," he only gave it "partial weight" due to the "internal inconsisten[cies]" previously discussed. *Id.*

At Step Four, the ALJ concluded that Bradbury is unable to perform his "past relevant work as a personal attendant and apartment manager" because "the personal attendant job is a semi-skilled, light job and the apartment manager job is a skilled, medium job." *Id.* At Step Five, the ALJ found that based on Bradbury's "[RFC], age, education, and work experience," he could handle a number of "unskilled light work" jobs that exist in significant numbers in the national economy, specifically that he could "perform the requirements of representative unskilled, sedentary occupations such as document preparer, food[,] and beverage order clerk, and office addresser. " AR 24.

## LEGAL STANDARD

### I.     DISABILITY DETERMINATION

A claimant is "disabled" as defined by the Social Security Act if he is (i) "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last

for a continuous period of not less than twelve months" and (ii) the impairment is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(A)–(B); *Hill v. Astrue*, 698 F.3d 1153, 1159 (9th Cir. 2012). To determine whether a claimant is disabled, an ALJ engages in a five-step sequential analysis as required under 20 C.F.R. § 404.1520(a)(4)(i)–(v).

In the first two steps of the evaluation, the claimant must establish that he or she (i) is not performing substantial gainful activity and (ii) is under a "severe" impairment. 20 C.F.R. § 416.920(a)(4)(i)-(ii). An impairment must have lasted or be expected to last 12 months in order to be considered severe. 20 C.F.R. § 416.909. In the third step, the claimant must establish that his or her impairment meets or medically equals a listed impairment described in the administrative regulations. 20 C.F.R. § 416.920(a)(4)(iii). If the claimant's impairment does not meet or equal one of the listed impairments, before proceeding to the fourth step, the ALJ is to make a residual functional capacity determination based on all the evidence in the record; this determination is used to evaluate the claimant's work capacity for steps four and five. 20 C.F.R. § 416.920(e). In step four, the claimant must establish that his or her impairment prevents the claimant from performing relevant work he or she did in the past. 20 C.F.R. § 416.920(a)(4)(iv). The claimant bears the burden to prove steps one through four, as "at all times, the burden is on the claimant to establish [his] entitlement to disability insurance benefits." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), *as amended* (Jan. 26, 1999). Once the claimant has established this prima facie case, the burden shifts to the Commissioner to show at the fifth step that the claimant is able to do other work, and that there are a significant number of jobs in the national economy that the claimant can do. 20 C.F.R. § 416.920(a)(4)(v),(g); 416.960(c).

## II.   STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), the court reviews the ALJ's decision to determine whether the ALJ's findings are supported by substantial evidence and free of legal error. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991) (ALJ's disability determination must be supported by substantial evidence and based on the proper legal

standards).  Substantial evidence means "'more than a mere scintilla,' but less than a preponderance."  *Saelee v. Chater*, 94 F.3d 520, 521–522 (9th Cir. 1996), *as amended* (Aug. 12, 1996) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401 (internal quotation marks and citation omitted).

The court must review the record as a whole and consider adverse as well as supporting evidence.  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006).  Where evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld.  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  "However, a reviewing court must consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Robbins*, 466 F.3d at 882 (quoting *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989)); *see also Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

### DISCUSSION

Bradbury claims that the ALJ erred by (i) improperly discounting Young's assessment and giving greater weight to Luoto's more limited opinion and the opinions of the non-examining consultants and (ii) failing to include all of Bradbury's non-exertional limitations in the RFC.  The Commissioner opposes Bradbury's summary judgment motion and moves to affirm the ALJ's decision as supported by substantial evidence.

### I.      YOUNG'S OPINION AS BRADBURY'S TREATING PHYSICIAN

The ALJ specifically rejected Young's 2017 opinion that Bradbury could only sit or stand/walk at one time for twenty minutes for a total of two hours in an eight-hour day and that his "cervical spine/neck pain require[s] him to rest his head/neck during the day (i.e., either lying down, resting head against [a] pillow, etc) … every 2 h[ou]rs."  AR 1311.  The ALJ gave three reasons for discounting Young's limitations concerning Bradbury's severe neck pain.  First, the ALJ discounted Young's opinion in his 2017 Medical Source Statement as internally inconsistent, because first Young indicated that Bradbury would "*not need to lie down at all during the workday,*" (when discussing Bradbury's ability to sit/stand/walk) but later in the same opinion when discussing Bradbury's "cervical spine/neck" condition he indicated that Bradbury would

"*need to rest the head/neck every two hours*," to relieve his neck pain.  AR 22 (italics added).

Second, the ALJ concluded that Young's opinion on Bradbury's neck limitations was not

consistent with Luoto's 2015 Reports, which did not mention any neck pain or limitations with

respect to Bradbury's "cervical impairment."  *Id.*  Third, the ALJ concluded that the claimant

himself had not alleged any problems moving his head or neck and did not "exhibit any problems

in this regard while testifying at the hearing."  AR 23.

Bradbury argues that the ALJ erred because:  (i) Young's opinion was not internally

inconsistent when considered in full and in context; (ii) Luoto's Reports could not be used to

discount Young because Luoto was not asked to consider (and his forms did not consider)

Bradbury's neck or cervical impairments and the scope of Luoto's assessment was to determine

entitlement to workers' compensation benefits and not for Social Security disability benefits

(under different standards); and (iii) Bradbury did repeatedly explain and complain about his neck

pain during the hearing.  Pl. Mot. 7–10.

The Ninth Circuit distinguishes between three types of physicians that provide information

about a claimant:  "(1) those who treat the claimant (treating physicians); (2) those who examine

but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat

the claimant (non[-]examining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995),

*as amended* (Apr. 9, 1996).  Generally, the opinion of a treating physician is entitled to greater

weight than the opinion of a non-treating physician.  *Id.*; 20 C.F.R. § 404.1527(d)(2).  However, a

treating physician's opinion "is not binding on an ALJ with respect to the existence of an

impairment or the ultimate determination of disability."  *Tonapetyan v. Halter*, 242 F.3d 1144,

1148 (9th Cir. 2001) (citation omitted).  To properly reject the opinion of a treating or examining

doctor when it is uncontradicted by another doctor, the ALJ must state "clear and convincing

reasons" for doing so.  *Lester*, 81 F.3d at 830.  If the treating or examining physician's opinion is

contradicted by another physician, however, an ALJ may reject the treating or examining

physician's opinion if she states "specific and legitimate reasons" that are supported by substantial

evidence.  *Id.* at 830–31.

If a treating physician's opinion is not given "controlling weight" because it is not "well–

United States District Court
Northern District of California

supported" or because it is inconsistent with other substantial evidence in the record, the SSA considers specified factors in determining the weight it will be given. Those factors include the "[l]ength of the treatment relationship and the frequency of examination" by the treating physician and the "nature and extent of the treatment relationship" between the patient and the treating physician. *Orn*, 495 F.3d at 631.

The ALJ found, and the plaintiff does not contest, that Luoto was a treating physician. AR 22. If Young's opinion was not contradicted by Luoto, the ALJ needed "clear and convincing reasons" to discount Young's opinion. If Young's opinion was contradicted by Luoto, then the ALJ only needed "specific and legitimate reasons" that are supported by substantial evidence to discount Young's opinion.

### A.    Luoto's Opinion Does Not Contradict Young's

Bradbury argues that Luoto's "limited assessment did not contradict Dr. Young" because Luoto's assessment was for workers' compensation benefits and considered only whether a specific set of conditions prevented Bradbury from performing his job in 2015. Pl. Mot. 6–7. Luoto needed only to find that Bradbury could not perform the lifting, bending, and stooping required by his former job. He did not need to consider or address all aspects of Bradbury's condition or the resulting limitations. To determine disability under the SSA, on the other hand, an ALJ must consider different levels of work and the range of all of a claimant's limitations before determining an RFC.

For this argument, Bradbury relies on *Desrosiers v. Secretary of Health and Human Services*, 846 F.2d 573 (9th Cir. 1988). In *Desrosiers*, the claimant filed for Social Security disability benefits and submitted workers' compensation reports from physicians that determined the claimant was "incapable of 'heavy' work." *Desrosiers*, 846 F.2d at 576. The claimant also submitted a report from a treating physician that concluded the claimant was limited to sedentary work based on the Social Security guidelines. *Id.* The ALJ found that the workers' compensation reports contradicted the treating physician's sedentary work opinion. *Id.* Rejecting that purported contradiction, the *Desrosiers* court noted that the workers' compensation reports were specifically for a California workers' compensation claim and the "heavy work" determination "was as far as

they [the physicians] had to go" for that purpose.  *Id.*  By finding that the claimant's workers' compensation reports and the treating physician opinion contradicted each other, the ALJ did not "adequately consider this distinction" between the workers' compensation and Social Security disability limitations.  *Id.* at 576.

Bradbury argues that because Luoto and Young were assessing different capabilities and Luoto did not need to address all of Bradbury's impairments, it cannot be considered "contradictory" to Young's more detailed analysis that specifically addressed Bradbury's neck pain and imposed limitations on Bradbury's neck movement.  Luoto did not specifically address or set a limit on Bradbury's neck movements (while recognizing Bradbury's complaints of neck pain consistently through 2015).  *See id.* at 576 (the reports from the workers' compensation assessors "did not contradict Desrosiers' claim of disability.").  The Commissioner responds that *Desrosiers* is inapposite because here, unlike in *Desrosiers*, the ALJ did not apply worker's compensation criteria, but instead considered Luoto's limitation of Bradbury to lifting no more than 15 pounds which, under the SSA, translates to a modified range of light work.  Def. Mot. 6.

The Commissioner misses the point.  Bradbury is not contesting the 15-pound lifting limitation Luoto imposed.  He is pointing out that Luoto did not need to consider and did not consider further limitations (like restrictions on neck movement) for purposes of assessing Bradbury for worker's compensation benefits.  Although Luoto did note Bradbury's complaints of neck pain and the Commissioner in his brief points out that — back in 2015 — Luoto found that Bradbury's neck range of motion was only limited by 10 or 20 percent and pain occurred only at "full endpoints" of range of motion (Def. Mot. at 6), that evidence was not relied on by the ALJ and cannot be relied on here to create a new "contradiction."

The ALJ erred because the opinions of Luoto and Young, when considered in full and in context, are not contradictory.

### B.    Young's Opinion was not Internally Inconsistent and is Supported by the Record

The ALJ also discounted Young's opinion that Bradbury has significant restrictions on neck movement because Young's limitations were allegedly internally inconsistent.  The alleged

1   inconsistency is that Young opined that Bradbury did not need to "lie down/recline during the

2   day," when discussing Bradbury's ability to sit/stand for limited periods during an eight-hour

3   workday, but immediately thereafter, when discussing Bradbury's cervical impairment, indicated

4   that Bradbury would have to rest his neck "during the day (i.e., either lying down, resting head

5   against [a] pillow, etc)," every two hours.  AR 1311.  Bradbury acknowledges that the Medical

6   Source Statement was "poorly worded" but argues the ALJ's characterization of Young's

7   responses as inconsistent is not supported.  Pl. Mot. 9.  Bradbury points out that where Young

8   mentioned the need to "rest" his head/neck every two hours — which could include lying down

9   but also other forms of resting the neck — Young was specifically addressing Bradbury's

10  established cervical impairment.  Where Young said "no" to the need to "lie down," he was

11  addressing Bradbury's limitation only related to sitting, standing, or walking.  As such, Bradbury

12  contends that Young was not internally inconsistent in his opinion.  I agree.  Given the full context

13  of the form, there is no contradictory inconsistency that would justify disregarding the specific

14  limitation that Bradbury's longtime treating physician imposed with respect to his cervical

15  impairment.[9]

16          Moreover, Young's neck movement limitation was — contrary to the ALJ's determination

17  — supported by the record.[10]  In 2013, Dr. Yablon opined about Bradbury's neck limitations,

18  concluding that he has a "moderately large central left-sided disc osteophyte complex pushing the

19

20  _____

[9] To the extent the ALJ found Young's responses unclear, the ALJ had a "duty to fully and fairly
21  develop the record and to assure that the claimant's interests are considered, … . This duty is
    triggered when the record reflects ambiguous evidence … ."  *Shafer v. Barnhart*, 120 F. App'x
22  688, 692–93 (9th Cir. 2005) (internal quotation marks and citations omitted).

23  [10] The State agency medical consultants completed Bradbury's initial and physical RFCs in
    December 2015 and June 2016, respectively.  Young's opinion was given in September 2017 and
24  the disability hearing was held in November 2017.  Bradbury argues that the ALJ also erred by
    giving "great weight" to the State agency medical consultants when "they did not have access to
25  the final 16 months of Young's records nor to Young's Medical Source Statement.  Pl. Mot. 6.
    The Commissioner responds that the State agency medical consultants had no obligation to review
26  Bradbury's entire record and that "regulations 'impose no limit on how much time may pass
    between a report and the ALJ's decision in reliance on it.'"  Def. Mot. 4; Def. Mot. 4, n. 2
27  (internal citation omitted).  That is not the point.  The agency consultant opinions cannot be used
    to discount Bradbury's long-term treating physician's opinion unless the ALJ identified clear and
28  convincing reasons to reject Young's opinion.  As discussed above, the reasons provided by the
    ALJ were erroneous and do not meet that standard.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   thecal sac back posteriorly and severely compressing the left C6 root."  AR 761–764.  In addition,

2   while Luoto's report forms did not ask about neck limitations, in each of his Work Status

3   documents he listed "neck" and "back pain" under the "Diagnosis" section.  AR 565 (July 20,

4   2015), 568 (June 8, 2015), 573 (April 20, 2015), 578 (March 9, 2015), 583 (January 23, 2015).

5   Young's neck movement limitation was also supported by Bradbury's testimony.  *See* AR 65–66

6   (when asked about holding his head up or changing his head's position by the ALJ, Bradbury

7   stated, "I'm just trying to get comfortable and I just don't have a way to do it."  Bradbury stated

8   that laying on his stomach, "makes my head go back … and it puts [my neck] in a bind and it

9   makes everything go numb.").

10          **C.      Bradbury did Complain About his Neck Pain, Specifically During the Hearing**

11          Finally, there is no dispute that, contrary to the ALJ's statement, Bradbury did repeatedly

12   and consistently complain of his neck pain; in fact, he discussed it repeatedly during the ALJ

13   hearing.  The Commissioner, in a footnote, argues that this error was harmless because the ALJ

14   had sufficient reasons to discount Young.  Def. Mot. at 7 n. 5.  As discussed above, those reasons

15   were erroneous.

16          Young's uncontradicted opinion on Bradbury's limitations could not be discounted for the

17   reasons identified by the ALJ, nor could the ALJ rely on the State agency consultants in light of

18   the uncontradicted limitations imposed by Young.  Remand is necessary so that the ALJ can give

19   Young controlling weight or identify clear and convincing reasons for not doing so.

20   **II.      FAILING TO INCLUDE NON-EXERTIONAL IMPAIRMENTS IN THE RFC**

21          Bradbury argues that the ALJ also erred by (i) providing inconsistent analyses and findings

22   concerning the source of Bradbury's mental health symptoms (e.g., were they the result of mental

23   impairments or pain/pain medications) and (ii) not addressing the effects of Bradbury's mental

24   impairments and his chronic pain on sustained work activity.  Pl. Mot. 11.[11]

25          As noted above, the ALJ found that Bradbury's mental health impairments were not severe

26

27   [11] Bradbury also suggests, in passing, that the ALJ erred at Step Two in not finding any of
     Bradbury's mental health issues severe.  Pl. Mot. 11.  However, Bradbury never fully raised this
28   argument and did not cite any caselaw in support.  Therefore, I do not reach it.

and that any limitations that flowed from his mental health impairments were either mild or if "more than mild" attributed to "pain and malaise, and possibly opioid dependence."  AR 18, 22. Gutfield, Bradbury's treating therapist from December 2014 – December 2015, opined that Bradbury's mental functioning was "unlimited" or "good" in all areas except for his ability to complete a normal workday without interruptions, which was characterized as "fair", but Gutfield's opinion was given only "partial weight" by the ALJ.  AR 21.  Examining consultant Cushman determined in January 2016 that Bradbury was capable of doing complex tasks but could not follow complex verbal instructions and "would have difficulty with regular attendance and completing a normal workweek due to pain and malaise," yet Cushman's opinion was given only "partial weight" by the ALJ.  AR 21–22.  Fitzpatrick and Colsky, the State agency consultants, completed reports about Bradbury in February and June 2016, respectively, and concluded that Bradbury had "moderate limitations affecting concentration, persistence, and pace … ."  AR 22.  Both were given "little weight" by the ALJ.  *Id.*

While the ALJ acknowledged that Bradbury's "pain" could be the source of his "more than mild" limitations, the ALJ never engaged with Cushman's diagnoses of pain disorder or Young's opinions that Bradbury suffered from "chronic pain," nor did the ALJ analyze the impact of the "more than mild" limitations that pain (or a pain disorder) imposed on Bradbury in terms of Bradbury's RFC.  *See, e.g.,* AR 1014 (Cushman stating that Bradbury would have difficulties with "regular attendance and consistent participation," resulting in difficulty working a normal workweek); AR 1312 (Young stating that Bradbury would miss "[m]ore than four days [of work] per month" and "Bradbury's pain would "[f]requently … **interfere with attention and concentration, persistence and pace** needed to perform even simple work tasks.") (emphasis in original).  In addition to the error in discounting Young's opinions (as discussed above) that impacted the ALJ's determinations as to potential limitations from mental health conditions, the ALJ's failure to engage with and identify the source (physical pain or pain exacerbated by mental health  conditions) of the acknowledged "more than mild" limitations was error and should be

United States District Court
Northern District of California

addressed on remand.[12]

<div align="center">

**CONCLUSION**

</div>

For the reasons above, I GRANT Bradbury's motion for summary judgment, DENY the defendant's motion for summary judgment, and REMAND the case for further proceedings consistent with this Order.

**IT IS SO ORDERED.**

Dated: August 18, 2020



William H. Orrick
United States District Judge

<div style="text-align: left; writing-mode: vertical">United States District Court
Northern District of California</div>

---

[12] Because of the errors identified herein, and the determination to remand for further proceedings, I do not need to reach plaintiff's arguments about errors with respect to the questions the ALJ posed to the VE.